CASE 13.—PROCEEDINGS BY ELLIOTT K. PENNEBAKER ADMINISTRATOR DE BONIS NON OF WARREN MITCHELL, DECEASED FOR A STTLEMENT OF HIS ACCOUNTS IN WHICH FLEMING WILLIAMS AND OTHERS FILED OBJECTIONS.—June 18, 1909.

## Pennebaker v. Williams

Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

SAMUEL B. KIRBY, Judge.

From the judgment plaintiff appeals and certain parties file cross appeal.—Reversed on original appeal and affirmed on cross appeal.

1.   Executors and Administrators—Contracts of Administrator— Validity.—A majority of the heirs of testator, entitled under the will to 51-56 of the estate, employed an attorney to prosecute a claim in favor of the estate, agreeing to pay the attorney a part of the amount collected. The administrator subsequently appointed, employed such attorney, his brother, to prosecute the claim on the same terms. The acts of the administrator in managing the estate were fair and along business lines. Held, that the administrator, in employing the attorney, was not guilty of improper conduct.

Pennebaker v. Williams.

2.  Executors and Administrators—Acts of Administrators—Statutory Authority.—Under the statute requiring the administrator to collect any claims due the estate, the administrator of an estate having no money may contract with an attorney on a contingent basis to enforce a claim against the federal government, rejected by the Court of Claims and by the federal Supreme Court, and thereby perform the duty imposed by the will directing the disposition of the proceeds of the claim, especially where legatees entitled to 51-56 of the estate had previously employed the attorney to enforce collection of the claim on the same terms.

3.  Contracts—Validity—Lobbying Contract.—A contract employing an attorney to prosecute a claim against the federal government for property seized by federal authorities during the Civil War is not invalid as a lobbying contract on it appearing that the claim was dependent on establishing before the proper committees of the federal Senate and House of Representatives the fact that the owner of the property had been a loyal citizen.

4.  Estoppel—Acts Constituting Estoppel.—Part owners of cotton seized by federal authorities during the Civil War, who permitted one of the owners to represent to the government that he owned all the cotton, and who intrusted the conduct of the prosecution of the claim to him, could not complain of the act of his administrator employing an attorney on a contingent basis to enforce the claim.

5   Executors and Administrators—Employment of Attorneys—Payment of Services.—Where an administrator properly employed an attorney to prosecute a claim due the estate, and the attorney rendered services which were acceptable to the administrator, the administrator should aid the attorney in the collection of his fees, and should at least not interpose any obstacles in the way of efforts of the attorney to collect his fees.

6   Executors and Administrators—Expenses of Administrator—Allowances.—A claim by an administrator for expenses incurred in collecting a claim due the estate must be rejected in the absence of a showing that the services were extraordinary.

7.  Executors and Administrators—Expenses for Administrator's Bond—Allowances—Statutes.—Under the statute allowing the administrator compensation not exceeding a specified per cent. of the gross amount which he receives and disburses, without authorizing the court to pay for the bond which he must give, the court cannot allow an administrator the sum paid a bonding company for signing his bond.

8.  Executors and Administrators—Compensation of Administrator.—Under the statute allowing the administrator compensation not exceeding a specified per cent. of the gross amount which he receives and disburses, the court should allow the administrator a commission on interest received by him on the funds of the estate pending a litigation involving the disposition of the funds.

9   Executors and Administrators—Compensation of Administrator—Allowance.—An administrator collected a claim from the federal government, based on the act of the federal authorities seizing during the Civil War property belonging to the decedent. The Court of Claims and the federal Supreme Court had rejected the claim. The intestate had endeavored during many years to enforce the claim, but without success. The administrator in collecting the claim was required to travel to and from Washington, and was required to give a large bond at considerable expense. Held, that he was entitled to an allowance of 5 per cent. on the gross sum received from the federal government.

10.  Executors and Administrators—Employment of Attorneys—Allowance.—Where it is necessary for a personal representative to have the assistance of an attorney in the settlement of the estate, the court must make a reasonable allowance as compensation for the services of the attorney.

11.  Executors and Administrators—Employment by Administrator of Attorney—Compensation—Allowance.—An administrator employed an attorney to collect a claim against the federal government. The attorney was successful. Third persons and persons interested in the estate brought suits involving the disposition of the sum collected, and the administrator employed an attorney. Held, that the administrator was entitled to an allowance for attorney's fees.

ON PETITION FOR MODIFICATION OF OPINION.

1.  Executors and Administrators—Commissions.—Where on the settlement of an administrator's account he had received $70,289.87, with interest earned since the date of the accounting, he was entitled to 5 per cent. on such sum in payment for all services rendered by him.

2.  Executors and Administrators—Counsel Fees.—An administrator, being required to administer the estate according to law, was entitled to a counsel of his own choosing, whose fees should be paid out of the estate.

3.  Executors and Administrators—Loaning Money—Interest.—Where an administrator of an estate in litigation could not

know when the litigation would end, nor how soon he
would be required to make a distribution, and was therefore
not warranted in loaning the money of the estate, except on
call, as he did, he was only chargeable with such interest as
he received in the exercise of due dilligence, and not for
interest at the legal rate.

OPINION OF THE COURT BY JUDGE LASSING—Revers-
ing.

Warren Mitchell had, for many years prior to
1861, been in business in Louisville, Ky. Many of h's
customers lived in the South, and, after the war be-
tween the states was declared, he obtained permis-
sion from the federal authorities to go South and
settle and adjust his business affairs with his South-
ern customers. While in the South, he purchased
from different parties 738 bales of cotton, which he
caused to be stored in Savannah. Thereafter, when
Savannah was captured by the federal authorities
under General Sherman, this cotton was seized and
sold by agents of the government, and the amount
realized therefrom, to wit, $128,692.22, was paid into
the treasury of the United States.

After the war was over, Mr. Mitchell employed
Hon. John M. Harlan, now a member of the Supreme
Court, and Hon. B. H. Bristow, who was afterwards
a member of the Cabinet, to bring suit in the Court of
Claims to recover the value of his cotton. The Court
of Claims, after consideration, dismissed the suit,
and, upon appeal to the Supreme Court of the United
States, the judgment of the Court of Claims was af-
firmed; the Supreme Court holding that Mr. Mitchell
had no valid claim against the government, and
should not be permitted to recover anything thereon.
This decision of the Supreme Court was handed
down in 1875. After having been thus denied the

right to recover in the courts, the claimant, Warren Mitchell, set about to secure the passage of an act of Congress to compensate him for the value of his cotton taken by the government, and from that time until his death, in 1889, he gave much time and attention toward securing the passage of such an act; and, although during this time he employed and was assisted by able lawyers in the presentation of his claim to the various congressional committees to whom it was referred, at the date of his death little progress had been made, and no law had been enacted which gave the desired relief. He left a will, the provisions of which, so far as this case is concerned, are as follows:

"Art. 1. I hereby appoint my friend, Sam'l Russell, the executor of this, my last will, and for the purpose of this will and the execution of the same, I vest him with the legal and equitable title to all my estate, real and personal, wherever it may be, with full power and authority to him to sell and convey any or all of the same, and to collect, compromise and settle any debts due me, and to prosecute a claim against the government of the United States, which is now pending before Congress, for the proceeds of cotton.

"Art. 2. It is my desire that my funeral expenses and just debts be paid, for which I may be liable at my death legally.

"Art. 3. After my debts and expenses of administration and the expenses of prosecuting the claim against the government mentioned, are fully paid, if anything is left, I leave to the children of my brother, Joseph, one-third; and to my sister, Harriett Williams, one-third; and to my sister, Julian Williams, one-third.

"Art. 4. Should my executor recover the amount due me from the government, memorandum of said claim is made a part of this will, and is attached and will guide him in settling between the parties interested with me in said claim, and to fix a fair compensation for my expenses and services, to be deducted from the whole proceeds before a division is made, and my portion of the proceeds I wish distributed as follows: * * *

"Art. 7. If the claim against the United States is collected, after payment of the before-mentioned debts, I desire and direct that the residue of my estate be divided as follows:

"One-third each to the children of my deceased brother, Joseph Mitchell, and my two sisters before mentioned, if they should survive me; if not, to their children and heirs at law; but during the settlement of my estate, should Mrs. Mary McLean survive me, I wish a small provision paid over to her, or some other person for her support, not exceeding $200.00 per year, provided my estate will allow it and leave funds sufficient to pay the expenses of prosecuting my own claim against the government of the United States before mentioned."

Samuel Russell, named in the will as executor, was a prominent lawyer of Louisville. He qualified and settled up the affairs of Warren Mitchell, and distributed the money that came to his hands as executor, some $2,700. Just what effort he made to carry out that provision of the will looking to the collection of this cotton claim from the government is not clear, though he evidently made some such effort. The settlement of his accounts as executor was confirmed by the Jefferson circuit court, and thereafter he died.

On September 6, 1902, E. K. Pennebaker was appointed administrator de bonis non with the will annexed of Warren Mitchell, by proper order of the Jefferson county court, and at once took active steps looking toward the collection of the cotton claim. Some time prior to his appointment, the law firm of Pennebaker & Jones, in Washington, had been interested in this claim, and had corresponded with certain of the legatees under the will of Warren Mitchell, deceased, who would be benefited materially by the collection of this claim, and they had entered into an agreement with all of said legatees save three, under the terms of which agreement they were to prosecute the collection of said cotton claim, and were to receive as compensation for their services in so doing one-half of any recovery that might result from their efforts.

After the appointment of E. K. Pennebaker, who was a resident of Louisville, Ky., and a brother of Charles D. Pennebaker, of Pennebaker & Jones, he made a contract with Pennebaker & Jones similar to that which had been made by several of the legatees. Before closing this contract of employment, however, he advised with the presiding judge of the Jefferson county court, who ratified and approved his acts in making said employment. Under the management of Pennebaker & Jones, the claim was pressed with vigor before Congress, and, in 1905, was finally allowed.

Although appointed in December, 1902, Pennebaker did not execute bond or take the oath of office until the early part of 1905, when it was reasonably certain that the act allowing said claim would be passed by Congress. He then executed the necessary bond, and shortly thereafter the act was passed

awarding to the legal representative of Warren Mitchell, deceased, $128,692.22, being the exact amount which had been realized by the government out of the cotton confiscated during the war as the property of Warren Mitchell, deceased.

As soon as it became an established fact that the government would pay this claim, Armstrong, Wilson & Summers set up a claim to an interest in this fund on the ground that they were the owners of a part of the cotton, and cited as evidence of this fact the will cf Warren Mitchell, and a certain memorandum therein referred to. This memorandum is as follows:

"Memorandum of My Cotton Claim against the Government of the United States.

"There was taken from my possession in Savannah, Georgia, as shown by the papers on file in Washington, in the Treasury and War Department, and on file before the United States Senate, 738 bales cotton. Of this cotton, 140 bales belonged to W .W. Summers, of Tennessee, and 40 bales to R. T. Wilson, of New York, 400 bales was the property of Mitchell & Armstrong, and 158 bales to me individually. Of the 400 bales of Mitchell & Armstrong, one-half, or 200 bales, belonged to me, and 200 bales to the heirs of C. Q. Armstrong, dec'd. I have had control and the management of the whole for more than 20 years, and have paid all of the expenses, and spent much time and money in prosecuting the claim against the government, and am entitled to a fair compensation for my expenses and services. W. W. Summers had 180 bales of cotton, which I had shipped for him from Griffin, Ga., to Savannah, on which I paid freight and charges at the compress and storage at Savannah, about $20,000 or the then market value of the 40

bales of cotton, which I took to my own account to reimburse me for the expenses paid by me. I afterwards advanced or loaned W. W Summers $500.00, for which I have his obligation, a part, I think $300.00 of which has been paid to me and the balance he still owes me with interest. I make this memorandum to show how this cotton claim stands in case of any accident to me or in case of my death.

"Witness my hand this 1st day of February, 1884.
"WARREN MITCHELL."

Memorandum on back of paper:
"358 bales to Warren Mitchell,
"200 " to the heirs of C. Q. Armstrong,
"140 " to W. Summers,
" 40 " to R. T. Wilson.

"738

"Memorandum of 738 bales of cotton. Sept. 29th, 1884. The within mem., is written by me in my own hand and is true and made a part of my will.
"WARREN MITCHELL."

The administrator, upon learning that Armstrong, Wilson & Summers were claiming an interest in the fund, went on to Washington to look after its collection. They were objecting to the payment of the contract fee of Pennebaker & Jones, and Pennebaker & Jones would not consent that the administrator take the fund out of the District of Columbia, but insisted on having their rights determined before the money was taken to Kentucky. With matters in this condition, it was agreed that the money should be drawn from the treasury in four drafts—one for $64,545.11, another for $32,173.06, and two for $16,086.53 each. This was done, and the administrator paid

to Pennebaker & Jones one-half of their contract fee, and the two drafts for $16,086.53 each were attached by Pennebaker & Jones, and after this was done it was agreed that this fund should remain on interest in one of the banks in Washington until the points of difference between the litigants were settled and adjusted by proper orders of court.

The administrator brought to Kentucky the draft for $64,345.11, and deposited it to his credit, as administrator, in the First National Bank, in Louisville, with an arrangement under which interest was paid on this deposit until at the date of the settlement the accumulated interest amounted to $5,924.76. The administrator, also, out of this fund advanced to Warren Mitchell, Jr., one of the legatees under the will, $100, and at the date of the judgment in this case the interest thereon amounted to $20, so that there was actually in the hands of the administrator at the date upon which the judgment was entered the sum of $70,189.87.

For the legatees it is contended that the administrator had no right or authority in law to make the contract by the terms of which he was to pay to Pennebaker & Jones one-half of the recovery on the cotton claim, and that, at most, he was limited to the payment of a reasonable fee, and that 50 per cent. is not a reasonable fee, but is largely in excess of what it should have been. They also complain that the allowance to the administrator in the circuit court was larger than it should have been, and that the allowance to his attorney for services in the litigation growing out of the settlement of the estate after he had received the money on the cotton claim was largely in excess of what it should have been. These

are the questions at issue between the administrator and the legatees.

For Armstrong, Wilson & Summers it is contended that the administrator had no right to contract to pay any sum whatever for the collection of that part of the claim in which they were interested, and that they are in no wise answerable for his acts in so doing, or properly chargeable with any sum whatever for the collection of their debt in excess of that which they have heretofore agreed with said Pennebaker & Jones that they would pay.

It appears that while the controversy over these matters was going on in Washington it was agreed between Pennebaker & Jones and Armstrong, Wilson & Summers that they should receive a certain part of the attached funds, and that the balance should remain subject to the order of the court until the litigation over this branch of the controversy was settled, and it is only as to the remainder of the fund which was attached in Washington that their controversy extends; they claiming that they are entitled to have and receive this balance of the money held under attachment in Washington, whereas Pennebaker & Jones claim that under their contract the money so remaining under attachment undisposed of belongs to them. The trial judge held that Pennebaker & Jones were entitled to a reasonable fee only for the services rendered by them, and he fixed this at 35 per cent. of the amount collected, and held the administrator personally responsible for the balance, or 15 per cent., which he had paid to them under his contract arrangement. Of this ruling, both the administrator and the legatees and Armstrong, Wilson & Summers complain.

He allowed to Lawrence Leopold, attorney for the administrator, $3,750 for services rendered the administrator in the lower court, and defending certain tax suits which were brought against the estate. Armstrong, Wilson & Summers and the legatees contend that it was excessive, and that the administrator, if entitled to any allowance on this account, should not have been allowed in excess of $1,000 for all such services.

The administrator alleged that he was compelled to and did make many trips to Washington looking after the collection of this claim, and the settlement of the litigation growing out of its collection after it was allowed by the federal government. The court rejected all of his claim for expenses except $344.40, and he allowed the administrator 5 per cent. on the money which he received and brought to Kentucky, but nothing on the moneys which were retained by Pennebaker & Jones for their fee, and nothing on the moneys which he received as interest on the fund which he had brought to Kentucky.

The questions, therefore, when reduced to their final analysis, are comparatively few and simple, and involve only the correctness of the court's ruling in fixing the allowance to Pennebaker & Jones for their services in collecting this claim, and (2) in fixing the allowance to the administrator for his personal service, expenses, and attorney's fees in settling the estate of Warren Mitchell, deceased, that came to his hands.

The serious complaint made by all parties interested in this appeal is as to the correctness of the court's ruling upon the first proposition. As above stated, prior to the appointment and qualification of appellant as administrator de bonis non of the estate

of Warren Mitchell, deceased, all of the heirs of said Warren Mitchell, who were entitled to receive under his will, and who are interested in this fund, save three, entered into an agreement in writing with Pennebaker & Jones, the Washington attorneys, by the terms of which they agreed to give to said Pennebaker & Jones one-half of such sum as they should recover on the cotton claim in question. Of those three who failed to sign, two were infants, and it is not clear why the third one did not sign, but, be that as it may, they represented jointly but five fifty-sixths of the entire interest under the will of Warren Mitchell, deceased, and the remaining fifty-one fifty-sixths entered into such agreement.

The administrator, it is true, is the brother of Charles D. Pennebaker, the lawyer, but, inasmuch as he merely in effect carried out the contract which had been made by practically all of those having any interest in this fund, we are unable to see where the foundation for the charge of fraud and collusion in this particular can be laid. Surely his doing what they themselves agreed to do does not offer any excuse for the charge that he was acting improperly or from corrupt or sinister motives. Nor do we see any good reason why the law firm of Pennebaker & Jones are subject to criticism or open to censure for suggesting, if they did suggest, that Pennebaker be appointed administrator. According to their theory of the case, some one had to be appointed administrator, and if they were right it was immaterial to them who such person was. No benefit could accrue to any one appointed administrator further than the compensation which, under the law, such appointment would bring to him in the event that his efforts to collect this claim met with success; and, inasmuch as the

legatees under the will of Warren Mitchell, deceased, had evinced a willingness to pay 50 per cent. of any recovery in order to induce a lawyer to undertake the collection of this claim, we feel that any administrator whom the court might have appointed would have entered into this contract in exactly the same way and upon the identical terms that this administrator did.

Nor is it at all strange that he failed to execute a bond immediately upon his appointment. The execution of a bond would necessarily involve the incurring of some cost and expense. The estate had no money. Warren Mitchell had practically spent everything he had in his futile efforts to collect this claim. If a bond were required at all it would necessarily have been one for a considerable amount, and it is neither unreasonable nor strange that appellant failed to execute such a bond until he saw some necessity therefor. His management of the estate, viewed from any standpoint, was fair, open, along business lines, and not subject to the criticism which counsel for appellees are disposed to place upon it, for the proof abundantly shows that the usual and customary compensation for undertaking to collect claims of this character in Washington is 50 per cent.

In the absence of any contract, under the proof in this case, Pennebaker & Jones have shown that 50 per cent. is a reasonable, or at least the usual and customary fee charged for such services. The presentation and prosecution of claims of this character in our own jurisdiction are rare; still, in the prosecution of claims which are of a doubtful and uncertain nature, it is not at all unusual for attorneys to contract for a contingent fee equal to 50 per cent. of

any sum that may be recovered either by suit or compromise. The litigant in such cases, as in the case at bar, usually has nothing with which to pay unless the venture proves successful, and hence the necessity for contracting to pay a fee in excess of that which would be necessary if the fee was certain, and not dependent upon a recovery.

We are clearly of opinion that the administrator, in making this employment under the circumstances, and in the way and manner in which he did, was not guilty of any fraudulent or improper conduct, and this brings us to the question as to whether or not he had power to make such contract. It is hardly necessary, however, to pass upon this question, for the reason that Pennebaker & Jones, in the absence of any agreement on his part, then had a contract covering fifty-one fifty-sixths of the claim which they were prosecuting, and, as to the remaining five fifty-sixths, there is no doubt but that, had these claimants been capable of contracting, or had the opportunity been presented to them to do so, they would have joined with their fellow claimants in undertaking to collect this debt.

The statute makes it the duty of the administrator to collect any claims that may be due the estate of the decedent, and, for his failure to exercise ordinary care to do so, he is liable upon his official bond. Now, in a case like the one under consideration, where the estate has no means, and the only asset is a vague and very uncertain claim against the government, grown hoary with age, been rejected by the Court of Claims, and, upon review, declared spurious by the highest court in the land, considered and discredited by the national Congress at several of its sessions, what is an administrator to do if he has not the right

to contract with attorneys upon a contingent basis to try and enforce the collection of the claim? But one of two courses are open to him: He must either make the best trade he can, or else abandon all effort to collect the claim. That the legatees under the will of Warren Mitchell, deceased, who were at all familiar with the conditions, did not desire that the effort to collect this claim should be abandoned, is evidenced by the correspondence which passed between appellant and Warren Mitchell, Jr., and between Warren Mitchell, Jr., and the judge of the Jefferson county court. They were anxious and more than willing that the administrator do everything in his power to further their interests in the collection of this debt. Certainly they are in no position to complain because he ratified what they, themselves, had already agreed to do.

And we may note in passing that the administrator in this case, even before he ratified and approved the contract which most of the legatees had previously entered into, sought the advice of the presiding judge of the Jefferson county court, the man to whom he would be called upon to make his accounting as administrator, if he met with success in the collection of this claim, and not until he had been advised by the county judge did he enter into this contract to pay this stipulated fee. It is argued that the county judge had no authority to enter the order approving this act.

For the purposes of this case, we deem it unnecessary to enter upon a consideration of this question, and only cite this fact as further evidence going to show that the administrator was acting all along in the best of good faith. Not only was the administrator justified in making this contract of employment

by the acts of the legatees themselves, and by the plain provision of the law making it his duty to collect claims due the estate, but the will itself, in article 7, thereof, imposed upon him the duty of undertaking its collection, even going so far as to direct what should be done with the proceeds thereof in the event that his executor met with success in his efforts looking towards its collection. The executor nominated in the will did not meet with success in his efforts to collect the claim; the legatees were unwilling that the small sum of money which their kinsmen and benefactor had left should be expended in an effort to collect it. While they were willing to contract for a large contingent fee for its collection, they were unwilling that he should spend even a portion of the $2,700 that came to his hands, and they, therefore, demanded that this sum be distributed among them, and it was accordingly done. During the remainder of his life, and until 1902, but feeble efforts were made toward collecting this claim, due, no doubt, to the fact that the executor was unable to procure the services of capable attorneys even upon a large contingent fee.

After Pennebaker & Jones took charge of the matter, the prosecution of the claim, as above stated, was pressed with diligence, and whether the success which accompanied their efforts was due to the skilled manner in which the claim was prosecuted, or to a changed condition in the sentiment of the membership of the national Congress toward meritorious claims of loyal citizens, can not be determined, but certain it is that in about three years they did what Warren Mitchell, deceased, aided and assisted by the best counsel he could procure, had spent the bet-

ter portion of a lifetime and a goodly fortune in a futile effort to accomplish.

Another objection raised by appellees is that the contract entered into was a lobbying contract, and, for that reason, against public policy, and should not be upheld or validated by the court. This objection is well answered by the trial court in the memorandum attached to his finding, in which he says: "There is no proof in the record to show that any lobbying was done, but there is proof that such services were rendered as any reputable lawyer might render under the circumstances. * * * From the testimony of Judge Fay, and the report of Senator Warren, it seems that one of the chief troubles which the claim had encountered before was a strong belief on the part of certain members of the Senate that Mr. Mitchell had not been a loyal citizen. It is not, therefore, difficult to understand how a lawyer might well properly employ himself with the Warren Mitchell claim without infringing morals or ethics. This case is to be distinguished from the case of Trist v. Child, 21 Wall 441, 22 L. Ed. 623. In that case the record plainly shows the unlawful methods employed by counsel, and the court very properly held that he could not recover."

The collection of the claim was, in the main, dependent upon its proper presentation to the necessary committee of the House of Representatives and the Senate. The appellant was wholly unable to attend to this work himself, and, in employing competent lawyers to represent him, he did no more, or rather no less, than discharge a plain duty which the law imposed upon him; and the law firm of Pennebaker & Jones, in accepting the employment, con-

tracted to render a service in every sense legitimate and proper.

As to the contention of Armstrong, Wilson & Summers that they were not properly chargeable with any part of the fee of Pennebaker & Jones for collecting this claim, or, if liable for any part, nothing in excess of a reasonable fee, it is only necessary to state that the only rights whatever which they have are those given them by Warren Mitchell, deceased, in his will. They recover nothing from the government. They had no claim against the government. They permitted Warren Mitchell, during his lifetime, to represent to the government that he owned all of the cotton, and that he was the sole owner of this claim. For about 40 years they intrusted the conduct of this business of the prosecution of their claim entirely to Warren Mitchell, and rested solely upon the confidence which they had in his honesty and integrity. They are now in no position to complain of the manner in which he prosecuted the claim, or the means employed and expenses incurred by him and his personal representatives in collecting same. Had they been unwilling to abide by any contract which he might make looking toward the collection of this claim, they should have interposed their objection at the time when they must have known that arrangements were being made with attorneys to look after the collection of this claim. Having failed to speak when it was their plain duty to have done so, they will not now be heard to say that they should not be chargeable with their just proportion of the expenses which were incurred by the representatives of Warren Mitchell, to whom they had intrusted the collection of their interest in this claim. The contract of employment which the administrator made with Pen-

nebaker & Jones was, under the circumstances of this case, fair and reasonable, and the chancellor should have given him credit for the 50 per cent. of the claim to which they were entitled.

Having determined that the contract of employment which the administrator made with the law firm of Pennebaker & Jones was neither inequitable nor unjust, it becomes unnecessary to consider the complaint made by appellees against the administrator for going to Washington, and, according to their idea, permitting himself to be sued there by Pennebaker & Jones for the fee which he had contracted to pay them. He had made the contract in good faith. The services were fairly and acceptably rendered, and instead of attempting to avoid the payment of their fee, as appellee would have had him do, it was his duty to have aided them in the collection of same, or, at least, if it was not his duty to have aided them in the collection of this fee, he certainly should not have interposed any obstacles in the way of their efforts to collect same.

The administrator reports that he paid $925 to a bonding company to sign the bond which the county court required of him, and he asks that these fees be refunded to him. The chancellor refused to allow them, and of this he complains. Likewise, he asks that certain expenses incurred by him in going to and returning from Washington, while looking after the collection of this claim, be allowed him, amounting in all to $784.40. The chancellor considered these claims and allowed him $344.40, rejecting the balance. This was error. He should have rejected this entire claim for expenses, as none of it was shown to be of that character designated as being extraordinary.

We know of no law authorizing the court to pay for the bond which the administrator is required to give. This is a condition which the statute imposes upon him in order that he may become administrator. While it is true he qualifies as administrator for the purpose of the settlement of the estate, and is, to that extent, acting for the benefit of the estate, still, by statute, he is allowed a compensation not exceeding 5 per cent. of the gross amount which he receives and disburses, and this, the law presumes, will compensate him not only for such services as he performs in the management of the estate, but, likewise, such expenses as are incident to the management of the estate. One of these expenses which is incident to the management of every estate is the cost of the execution of the bond. The statute makes special provision whereby the court is authorized to allow the administrator, in addition to the statutory allowance of 5 per cent., further compensation for any extraordinary or unusual expenses to which he may be put in the conduct and management of the estate. He allowed the administrator 5 per cent. on all of the fund which he received and brought to Kentucky, but allowed him no commission on the money which he received as interest on said fund during the pendency of this litigation. This, we think, was error. The record shows that he received, as interest from the bank, on the contract which he made with it whereby the money should draw interest while it remained on deposit, the sum of $5,924.76. He likewise received from another source $20, making the total gross sum that came to his hands as administrator $70,290.87.

We are of opinion that on account of the character of service which the administrator rendered in this case, the distance which he was required to travel in

Pennebaker v. Williams.

going to and returning from Washington in the prosecution of this claim, and the large bond which he was required to give at a considerable expense, the chancellor should allow him 5 per cent. on the gross sum which he received, and must, under order of court, disburse.

The only remaining question is that of attorney's fees allowed to Lawrence Leopold for services rendered the administrator in the litigation in which he has been involved since the fund was collected by Pennebaker & Jones. The chancellor allowed the administrator for such services so rendered $3,750. This litigation, in the main, grew out of the efforts of Armstrong, Wilson & Summers, and other legatees under the will of Warren Mitchell, deceased, to defeat Pennebaker & Jones in the collection of their contract fee. The questions being raised, appellant was compelled to litigate them. Under an unbroken line of authorities in this state, where it becomes necessary for a personal representative to have the advice and assistance of an attorney in the settlement and adjustment of an estate, it is the duty of the court to make him a reasonable allowance as compensation for such attorney's services. Considering the amount of the estate involved, and the character and extent of the litigation, we are of opinion that the fee of $3,750 allowed is a fair and reasonable fee. This expenditure was brought on by Armstrong, Wilson & Summers, as well as by the residuary legatees, and it is proper that they should each bear an equitable proportion of these expenses.

It appears that, during the trial in the lower court, it was agreed that there should be paid out of the fund on hand the debts which Warren Mitchell directed in his will to be paid. These amounted in the

aggregate to $16,957.04. It was also agreed that a certain legacy, amounting, in the aggregate, to $580, should be paid, and this was done, making a total of $17,537.04, which was, by agreement of parties, paid out of the fund on hand. It was further agreed that the residuary legatees of Warren Micthell were entitled to receive out of the fund in gross $10,000 to compensate them for the money which Warren Mitchell had expended in his lifetime in his effort to collect this claim. With these sums, of course, the administrator, in his settlement, must be given credit. In addition thereto he is entitled to $3,514.54 commissions, $730 taxes paid, and court costs, including his attorney's fees of $3,750. These credits must be deducted from the $70,290.87 which represents the assets in gross in the administrator's hands, as shown by the judgment of the chancellor. Of the remainder, the heirs of C. Q. Armstrong are entitled to .2710 per cent., R. T. Wilson is entitled to .0542 per cent., W. W. Summers is entitled to .1897 per cent., and the residuary legatees, the Mitchell heirs, are entitled to .4851 per cent. To this .4851 per cent. must be added the $10,000 to which, by agreement of parties, they are entitled; and, of the resulting sum, Warren Mitchell, Jr., is entitled to one-third, the heirs of Harriett Williams, one-third, and the heirs of Julian Williams, one-third. It appears that Warren Mitchell, Jr., has heretofore received from the administrator $100 and this, with accumulated interest, should be deducted from his share. If any interest has accumulated on the fund in bank since the rendition of the judgment herein, this accumulation should be prorated among the Mitchell heirs, Armstrong, Wilson & Summers, according to their inter-

ests above set out, and any claim for taxes for 1909 should be borne by them in like proportion.

The judgment is reversed on the original, and affirmed on the cross-appeal, with directions to the trial court to enter a judgment in conformity with this opinion.  On the appeal of Fleming Williams et al. v. Henry R. Summers' Administrator et al., the judgment is affirmed.

ON PETITION FOR MODIFICATION OF OPINION—Judge LASSING.

· In the opinion delivered herein the directions as to how the funds on hand should be distributed were not sufficiently explicit, and some confusion has been occasioned thereby.  To remedy this trouble the opinion is now extended.

At the date of the settlement referred to in the judgment appealed from, the amount of money which the administrator had received, together with its accumulated interest, amounted to $70,289.87, and this sum, augmented by such interest as it has earned since that date, constitutes the entire fund in the hands of the administrator.  As stated in the opinion, he is entitled to 5 per cent. on the gross sum thus handled, in full payment for all services rendered by him in administering the estate.  The compensation allowed to his attorney for services in settling the estate after he collected the money from the government is a proper charge against the entire fund. Armstrong, Summers, and Wilson take under the will, and, until the questions raised in this litigation were settled the administrator could not know to what share of the estate these claimants were entitled.  It was his duty to administer the estate ac-

cording to law, and not according to the idea of any particular claimant. He was, therefore entitled to counsel of his own, to whom he could look for guidance and direction in the settlement of the estate; and, as this service was rendered the administrator for the benefit of the entire estate, the entire estate should be charged with the expense thereof. The authority cited and relied upon by certain of the claimants is not in point, and does not .conflict with this view.

In making distribution there should be deducted from the entire fund in the hands of the administrator the costs of administration, including his commission and the compensation allowed his attorney, and also all taxes against the estate, together with the sum of $10,000, which, by agreement, was to be deducted therefrom and added to the portion going to the devisees of Warren Mitchell, deceased. Of the remainder, .2710 per cent. should be paid to the heirs of C. Q. Armstrong, .0542 per cent. to R. T. Wilson, and .1897 per cent. to W. W. Summers, as directed in the opinion herein and authorized by the memorandum attached to and made a part of the will. This leaves .4851 per cent. going to the devisees under the will of Warren Mitchell, deceased. To this must be added the $10,000 above referred to. Out of the sum thus created there must first be paid the special bequests (debts and a legacy) named in the will of Warren Mitchell, and after these are satisfied, the remainder thereof must be paid to the residuary legatees, as set out in the opinion. Some of these special bequests have already been paid. To that extent the direction herein given as to distribution is satisfied.

We do not pass upon or attempt to settle the question as to who owns the $16,083.53 deposited in the

trust company in Washington, for the estate of War-ren Mitchell has no interest whatever therein. It be-longs to either  Pennebaker and Jones or  to Arm-strong, Summers, and Wilson, or both, as may be de-termined from a proper construction of the agree-ment between them, entered into at the time the money was so deposited in said trust company.

The  contention on the part of  the administrator for extra compensation was fully considered in the opinion, and there appears to us no good reason why the position then taken should be receded from.  A further consideration of this question is, therefore, unnecessary.

In response to the complaint that the administrator should be charged the legal rate of interest for the money which came to his hands, from the time he re-ceived it until the date of distribution, it is only necessary to state that his duty required him to col-lect and preserve the estate and make distribution thereof as soon as he reasonably might.  He was not called upon to loan out this money.  He could not know when the litigation would end, or how soon he would be required to make distribution, and hence he would not have been warranted in lending the money, except as he did upon call.  Under the cir-cumstances he received a fair rate of interest, and has enriched the estate to that extent, and he should be charged only with the interest which he actually received.  This has been done, and there is no merit in the complaint that he has not been required to pay more.

The petition for a rehearing and petitions for fur-ther modification and extension are each overruled.